**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

JOEL MURRAY,

                                        Plaintiff,

        v.                                                          No. 08-CV-809
                                                                        (DNH/DRH)

DR. RAMINENI, Medical Director, Mid-State
Correctional Facility; A. FERGUSON, N.P.,
Mid-State Correctional Facility; DR. MANNAVA,
M.D., Mid-State Correctional Facility; PICENTE,
Correction Counselor, Mid-State Correctional
Facility; STATE OF NEW YORK DEPARTMENT
OF CORRECTIONAL SERVICES; NURSE
HOWARD, Mid-State Correctional Facility;
WILLIAMS, Nurse, Mid-State Correctional Facility;
A. PAOLANO, Dr., Great Meadow Correctional
Facility; and J. HARRIS, Nurse Administrator,
Mid-State Correctional Facility,

                                        Defendants.
_____

**APPEARANCES:**                          **OF COUNSEL:**

JOEL MURRAY
Plaintiff Pro Se
00-A-1884
Elmira Correctional Facility
Post Office Box 500
Elmira, New York 14902

HON. ERIC T. SCHNEIDERMAN            DEAN J. HIGGINS, ESQ.
Attorney General for the                      Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

                          **REPORT-RECOMMENDATION AND ORDER**[1]
_____

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Joel Murray ("Murray"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, DOCS and eight DOCS employees, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments.  Additionally, Murray asserts claims pursuant to 42 U.S.C. §§ 1985 and 1986 and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq..  Compl. (Dkt. No. 1).  Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 57.  Murray opposes the motion.  Dkt. No. 69.  For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The facts are related herein in the light most favorable to Murray as the non-moving party.  See subsection II(A) infra.  The events occurred while Murray received medical treatment from 2004 until May of 2006 at Great Meadow Correctional Facility and from May 2006 until December 2008 at Mid-State Correctional Facility.  See generally Compl.; Murray Dep. (Dkt. No. 57-5) at 10-11, 13.  Murray claims a disability due to swelling in his legs and ankles, chronic back pain, and problems with his veins, colon and blood which require him to use a cane for the rest of his life.  Compl. ¶¶ 29, 40, 61; Murray Dep. at 24.

## A. Joint Pain – Ankles and Back

Prior to his incarceration, Murray reported no problems requiring medical attention concerning his legs.  Murray Dep. at 34.  In November 2004, while incarcerated at Great

2

Meadow, an x-ray of Murray's left ankle revealed no evidence of fracture and only mild swelling.  Murray Dep. at 13; M.R. at 89.[2]  In April 2006, Murray received a prescription pain medication to alleviate his complaints of chronic pain.  M.R. at 41.  On April 25, 2006, Murray complained of pain in his left leg, chest, and back.  M.R. at 40.  The medical staff scheduled x-rays of Murray's cervical, thoracic, and lumbar spine.  Id.  A week later, Murray continued to complain of pain, reporting that the prescription medication which he was taking was not providing relief.  M.R. at 39.

On May 6, 2006, Murray arrived at Mid-State.  Murray Dep. at 10-11; Ramineni Decl. (Dkt. No. 57-11) ¶ 4.  On May 8, Murray failed to appear for a scheduled examination.  M.R. at 39.  The following day, medical staff noted that Murray was complaining of back pain and that he used a cane, back brace, and leg stockings.  M.R. at 38.  Additionally, Murray was taking prescription pain medication and Prilosec for his intestinal problems.  Id.  On May 10, Murray alleged that he fell while he was carrying his property to his cell.  M.R. at 37.  Upon physical examination, it was noted that although Murray claimed to have scraped his back, there were no abrasions and he could still ambulate normally.  M.R. at 37.  The following day, Murray continued to complain of back pain and was given a tab of Percocet.  M.R. at 36.  On May 13, Murray was admitted to the Special Housing Unit ("SHU"),[3] and was

_____

[2] M.R. indicates a cite to Murray's medical records which were filed traditionally with the court.  In Murray's response papers, he utilized many of the same medical records which defendants had previously filed in the M.R.  See generally Dkt. No. 69-9 at 31-70; 69-13 at 7-13; 69-18 at 39-56; 69-20 at 14-51; 69-22; 69-25 at 2-8.  For organizational purposes, citations will be made only to the M.R..

[3] SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b) (1995).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for

described as ambulating with a cane, wearing an ace bandage wrapped loosely around his waist, and claiming he had "many medical problems."  M.R. at 35.  Murray's prescription pain medication was continued upon his admission to SHU and the use of the cane was noted to have been due to the fall he had sustained the previous week.  MR. at 34-35.

On May 18, Murray was examined again complaining of back pain and requesting a cane permit.  M.R. at 34.  Medical staff noted suspicions of malingering and scheduled him to see the doctor.  Id.  On May 23, defendant Dr. Ramineni examined Murray and found no evidence of spinal deformity, no muscle wasting, and no evidence of sensory defects.  M.R. at 33; Ramineni Decl.  ¶ 4.  There was "[n]o objective evidence of discogenic disease," Murray's back brace was discontinued and requests for a cane would have been denied due to a lack of medical necessity, and malingering again was noted on the charts.  M.R. at 33; Ramineni Decl. ¶ 4. On May 30, the x-ray results supported this conclusion showing generally normal results with no evidence of fracture or malalignment and only "[m]ild degenerative change[s]."  M.R. at 80; Dkt. No. 1-2 at 48.

On June 1, 2006, Murray was brought to the infirmary on a stretcher claiming that, while climbing into the top bunk, his leg gave out.  M.R. 33.  Murray complained of pain in his forehead, abdomen, and back.  M.R. at 33.  Upon examination, there were no obvious bruises, marks, or deformities on Murray's body, he retained full range of motion in all four of his extremities, he was noted to have "exaggerated coughing [and] moaning [fits] when people [were] in the room," and he was breathing easily.  M.R. at 33.  Murray was offered ibuprofen for pain relief and refused.  M.R. at 33.  The medical staff ordered Tylenol,

---

administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

provided him with ice, and instructed him to follow up with a doctor in the morning.  M.R. at 33.  The following day, Murray was walking around the infirmary and stating that he was in little pain and wanted to leave, so he was discharged to general population with pain medication.  M.R. 32, 151.

On July 20, 2006, Murray was seen by defendant Dr. Mannava for complaints of chronic lower back pain, hypertension and swelling in his legs, and peripheral vascular disease ("PVD")[4].  Mannava Decl. (Dkt. No. 57-6) ¶ 3;  M.R. at 3.  The objective findings indicated tenderness and slight scoliosis in his back.  M.R. at 3.  The plan was to continue providing Murray with pain medication, including increasing the dosage for medications he had already been receiving and ordering a blood test for a basic metabolic blood profile. Mannava Decl. ¶ 3; M.R. at 3.  Pain medication was again administered to Murray on July 31.

On August 17, 2006, Murray complained of back pain and of being made to sweep and mop which, given his weakened state, had caused him to fall twice.  M.R. at 29; Ferguson Decl. ¶ 12 165.  Medical staff questioned the credibility of these statements and believed that Murray was malingering.  M.R. at 29.  Defendant Howard offered, and Murray refused, muscle rub for his back and was scheduled to see the doctor on August 22.  Howard Decl. ¶ 12; M.R. at 29.  On August 21, Murray returned to the infirmary complaining of head pain and claiming to have fallen, breaking the fall with his hands.  M.R. at 29.  While not complaining of injuries, he claimed to have felt a burning sensation in his left leg.  M.R. at

_____

[4] Peripheral vascular disease classifies "[d]isorders affecting the arteries, veins, and lymphatics of the extremities."  The Merck Manual 1784 (17th ed. 1999) [hereinafter "Merck Manual"].

5

29.  Murray was given pain medication and discharged.  M.R. at 29.  The following day

Murray was seen by Dr. Mannava, complaining of mild lower back pain with a history of

scoliosis and degenerative changes and suffering from several falls, yet claiming to have

experienced no injuries.  Mannava Decl. ¶ 4; M.R. at 28.  Dr. Mannava noted scoliosis in

Murray's back, and provided him with pain medication.  M.R. at 28.

On October 27, 2006, Murray again complained of lower back pain and sought a back

support.  M.R. at 27.  The medical staff informed Murray that they did not have the

requested back support available.  M.R. at 27.  Three days later Murray was seen by

medical staff, including defendant nurse practitioner Ferguson, and it was reaffirmed that

his prior x-rays showed mild degenerative changes, he had been on medication for his

lower back pain for quite some time, and his back complaints had been addressed on

multiple occasions.  Ferguson Decl. (Dkt. No. 57-7) ¶ 4; M.R. at 27.

On November 2, 2006, Murray requested a bottom bunk permit, although medical

records indicated that his x-rays only showed mild degenerative changes in his back.  M.R.

at 27.  An evaluation was scheduled for November 7.  M.R. at 27.  However, on November

7, Murray returned to the infirmary because he reported that while climbing into his top

bunk, his left ankle gave out and he fell.  M.R. 26; Dkt. No. 1-2 at 31.  Murray complained of

pain in his shoulder and back, though the side which he said hurt versus the side that he

indicated was injured were inconsistent.  M.R. 26; Dkt. No. 1-2 at 31.  Additionally, Murray

denied any head injuries or loss of consciousness.   M.R. 26; Dkt. No. 1-2 at 31.

Examination showed no marks or bruises on the left or right side of his body and a positive

range of motion in all his extremities.  M.R. 26; Dkt. No. 1-2 at 31.  Murray became "agitated

[and] overly excited when any part of his body [was] touched."  M.R. 26; Dkt. No. 1-2 at 31.

Other inmates reported that Murray had been stating his intentions to "get off th[e] unit" for days.  M.R. 26; Dkt. No. 1-2 at 31.

The medical assessment indicated that this injury was probably staged and that Murray was malingering, further evidenced by the fact that he (1) pretended to be unconscious on the stretcher and then come alive suddenly and (2) was able to, while laying down, hold and sign a clipboard despite prior claims that he was unable to move.  M.R. 26; Dkt. No. 1-2 at 31.  He was ultimately admitted to the infirmary after his fall, where he again complained of pain in his left shoulder and ankle.  M.R. at 150.  While he complained he was having difficulty walking, Murray objectively had no major problems with movement or serious deformities and the suspicion that he was malingering continued.  M.R. at 150.  The following day, Murray did not want to see any medical staff or receive any treatment.  M.R. at 149.  This continued the following day, when Murray indicated that he wanted to leave the infirmary despite the doctor's recommendation to keep him in bed.  M.R. at 149.  Murray reported that he slept in a partially seated position throughout the night, had not had any more falls, was observed to be ambulating, refused taking any pain medication, and was eventually discharged back into general population.  M.R. at 148.  Murray left the infirmary without difficulty, walking normally and exhibiting no problems with his gait or signs of swaying.  Mannava Decl. ¶ 5;  M.R. at 148.

On December 7, 2006, Murray again complained of a headache and left ankle and back pain.  M.R. at 25; Dkt. No. 1-2 at 30.  Murray was given pain medication and thigh high compression stockings.  M.R. at 25; Dkt. No. 1-2 at 30.  The following day Murray arrived at the infirmary again complaining of a headache and ankle and back pain.  M.R. at 25; Dkt. No. 1-2 at 30.  It was noted that Murray had no aggravating or alleviating factors and that he

was ambulating with a limp.  M.R. at 25; Dkt. No. 1-2 at 30.  His eyes were examined and he was given ibuprofen and instructions to follow up with a physician.  M.R. at 25; Dkt. No. 1-2 at 30.

On December 18, 2006, Murray returned with continued complaints of headaches, ankle pain, and back pain.  M.R. at 24; Dkt. No. 1-2 at 29.  Murray stated he was feeling no relief from the ibuprofen and Tylenol he was currently receiving and requested a prescription pain medication.  M.R. at 24; Dkt. No. 1-2 at 29.  Medical staff informed Murray that he had chronic lower back pain caused by degenerative changes for which no narcotics would be given, but Murray was prescribed a muscle relaxant for a short term period.  M.R. at 24; Dkt. No. 1-2 at 29.

On January 11, 2007, Murray again complained that his left ankle was painful and swollen and required a foot soak from jumping up and down off his top bunk.  M.R. at 24; Dkt. No. 1-2 at 29.  Murray was given refills of his medication at the conclusion of the appointment.  M.R. at 24; Dkt. No. 1-2 at 29.  A week later, Murray presented with additional complaints of left ankle pain and swelling.  M.R. at 24; Dkt. No. 1-2 at 29.  There was no recent injury to the area, so the medical staff provided Murray with medication, exercises, and an order for an x-ray.  M.R. at 24; Dkt. No. 1-2 at 29.  The radiology reports determined that there were "no fractures or dislocations noted . . . . There is mild degenerative change of the ankle joint," and the overall impression was the presence of "[m]ild degenerative bony change . . . ."   M.R. at 79; Dkt. No. 1-2 at 47; see also Ferguson Decl. ¶ 5.

On March 13, 2007, Murray began requesting the prescription medication which was given to him in December of 2006.  M.R. at 23.  The requests were denied as medical staff

8

had already explained to Murray that this prescription was for short term use only.  M.R. at

23.  Murray asked for, and was again denied, the same prescription on March 22.  M.R. at

23.  On March 27, 2007, Murray was scheduled to speak with the nurse practitioner

regarding his pain medication.  M.R. at 23.  Again on April 3, 2007, Murray sought the same

short term prescription medication for his back and was denied, being told that the

medication was only for short term use and that his x-rays only showed mild degenerative

changes in his back.  M.R. at 22.  Instead, the medical staff provided Murray with muscle

pain relieving cream and naproxyen.  M.R. at 22.

On July 6, 2007, Murray complained of left ankle pain and was given a follow up

appointment with a doctor.  M.R. at 21; Dkt. No. 1-2 at 28.  Upon examination by Ferguson

three days later, his feet had pink skin and positive pedal pulses, he was given compression

stockings for his pain, and reminded that his previous diagnosis of degenerative joint

disease still remained.  Ferguson Decl. ¶ 7; M.R. at 20; Dkt. No. 1-2 at 27.  On July 16,

Murray complained that his legs were still bothering him even when he was wearing the

compression stockings, and another follow up appointment was scheduled.  M.R. at 20;

Dkt. No. 1-2 at 27.  The following day Murray continued to complain about the level of pain

medication he was receiving.  M.R. at 20; Dkt. No. 1-2 at 27.  When Murray was examined

by the nurse the following day, he failed to attend, although the nurse commented that

these issues had previously been discussed and managed on July 9, no further intervention

was required, and he could follow up with sick call.  Ferguson Decl. ¶ 8; M.R. at 19.

On July 19, 2007, Murray returned to the infirmary with complaints of leg pain, and it

was noted that he had been "asked to leave [the infirmary] yesterday [because he was]

causing a disturbance."  M.R. at 18; Dkt. No. 1-2 at 26.  He returned the following day,

again complaining of pain and seeking pain medication and an excuse from work.  M.R. at 18; Dkt. No. 1-2 at 26.  Both requests were denied given his outburst a few days earlier.  Howard Decl. ¶¶ 6-7; M.R. at 18; Dkt. No. 1-2 at 26.  Murray returned with complaints of knee pain on July 23 and was given ibuprofen.  M.R. at 17.

On July 31, 2007, Murray submitted a request for a reasonable accommodation, seeking the return of his cane, as his pain and suffering when he walks is disabling.  M.R. at 165; Howard Decl. ¶ 9.  The request was denied, citing the fact that Murray had no medical disability or functional limitations.  M.R. at 165; Dkt. No. 1-1 at 81.  Murray also complained that he wanted a second opinion regarding his leg, and was informed that he could not choose his doctor.  M.R. at 16; Dkt. No. 1-2 at 25.  On August 2, 2007, Murray returned with complaints of left leg swelling and ankle pain despite elevating his leg, so Murray was ordered not to work for two days and given ibuprofen for the pain.  M.R. at 16; Dkt. No. 1-2 at 25.  A few days later Murray returned, claiming the ibuprofen was aggravating his stomach, so his pain reliever was changed to Tylenol.  M.R. at 15.  Upon arrival, medical staff noticed that Murray was not wearing his compression stockings as advised.  M.R. at 15.

On August 15, 2007, while working in the mess hall, Murray slipped on water and fell on his right leg and ankle.  M.R. at 14; Murray Dep. at 17-19, 20-21.  Murray contends that he had been complaining about his legs giving out for two weeks prior to falling.  Murray Dep. at 20.  Murray was sent to St. Luke's emergency room, seen by a doctor, and given ice.  Mannava Decl. ¶ 7;  M.R. at 14.  Murray indicated to the doctor that he had failed to take his blood pressure medication for the previous five days because he did not have any left.  M.R. at 14.  X-ray reports from the hospital indicate that there was a spiral fracture in

Murray's right ankle and, thus, the medical department at St. Luke's instructed him to rest, ice, and elevate his leg, and wear the air cast and use the crutches provided to him by the hospital to ambulate until his follow up appointment.  Mannava Decl. ¶ 7; M.R. at 147; Dkt. No. 1-2 at 63; Murray Decl. at 38.  Murray refused any pain medication.  M.R. at 147; Dkt. No. 1-2 at 63.  The doctor discharged Murray back to Mid-State with the air cast and crutches.  M.R. at 14, 129; Dkt. No. 1-2 at 63.  Upon return to Mid-State Murray was admitted to the infirmary due to his difficulty ambulating on the crutches.  Dkt. No. 1-2 at 62.  Dr. Ramineni felt there was no "medical reason for an ADA request for reasonable accommodation [as h]e had a . . . fracture and he was given crutches."  Ramineni Decl. ¶ 8.

The following day, Murray refused to have his vitals taken by infirmary staff, stating that he did not want anything from the medical department.  Dkt. No. 1-2 at 62; Howard Decl. ¶ 11.  Staff characterized him as "argumentative" and he continued to refuse to take pain medication throughout the day.  Id.  Murray was discharged back to general population that day, with instructions to avoid weight bearing and stairs, continue wearing the air cast, resting, icing and elevating the leg and using the crutches, and to take pain medication as needed.  Mannava Decl. ¶ 7; M.R. at 13, 143, 145-47; Dkt. No. 1-2 at 61-62, 64.  Murray was offered a prescription for pain medication, but he again refused to take it.  M.R. at 146-47; Dkt. No. 1-2 at 64.  On August 17, Murray requested a nut for his crutches, but was otherwise doing well.  M.R. at 13.

On August 27, 2007, Murray arrived at Sing Sing Correctional Facility ("Sing Sing") to attend a deposition, and was seen by medical staff there who noted decreased pedal pulses and swelling in his right leg and recommended further evaluation given his recent fracture.  M.R. 9-10, 11.  Murray was transferred immediately to Mt. Vernon Hospital for

evaluation and casting.  M.R. at 10, 128.  X-rays at Mt. Vernon showed an "oblique fracture

. . . in satisfactory position."  Dkt. No. 1-2 at 39-41, 43.  Additional diagnostic tests at Mt.

Vernon included (1) a chest CT which showed that "[t]he lungs [we]re free of infiltrate [and

that there was] . . . no active pulmonary disease;" (2) an ultrasound of the veins in Murray's

legs which showed a blood clot in a portion of his leg; and (3) a doppler report from his leg

which also showed the clot in one spot of his leg though "[e]lsewhere, [there is] normal

vascular flow identified."  M.R. at 77; Dkt. No. 1-2 at 42, 44-45.  Murray was discharged

from Mt. Vernon back to Sing Sing on August 31, 2007 with a below-the-knee leg splint,

crutches, and instructions not to bear weight on his right side and to follow up with the

orthopaedic.  M.R. at 132; Dkt. No. 1-2 at 56.  Medical staff at the correctional facilities were

instructed to schedule a follow up appointment and to "[m]onitor [Murray's blood work] to

adjust [the blood thinner] dose."  M.R. at 132, 142; Dkt. No. 1-2 at 54, 56.

   For the following five days, Murray remained in Sing Sing's infirmary.  M.R. 90-91, 104,

107, 109.  At first, Murray was seen dressing in his room, having mild swelling in his leg yet

still feeling pedal pulses, receiving treatment and medication from staff.  M.R. at 90-91.

However, as time progressed Murray began refusing to take medication, have his vitals

monitored or see medical staff, refusing to sign the medical refusal forms, and becoming

combative and complaining.  M.R. at 91, 104-106, 109.  Medical staff still continued to

monitor Murray and he was observed to be able to use his crutches with a quick and steady

gait, his lungs were clear, and his feet were warm and had positive pulses.  M.R. 91, 104.

On September 5, Murray was discharged from Sing Sing's infirmary and on September 6,

he arrived back at Mid-State and was again admitted to the infirmary.  M.R. at 13, 137, 140.

Upon arrival, Murray was in fair condition with good vital signs and plans to begin therapy

and have an orthopaedic consultation.  M.R. at 138, 164.  Following this fall, Murray was granted bottom bunk permits from time to time.  Mannava Decl. ¶ 9.

After Murray returned to DOCS custody after visiting Mt. Vernon, DOCS decided to put a cast on his leg.  Murray Dep. at 41.  On September 7, 2007, a letter from defendant Dr. Rubinovich to Dr. Mannava indicated that Murray had fractured his ankle and was immobilized in a short leg cast, x-rays were taken again and it was projected that the cast would be removed on or about September 28th though the exact details were still unknown.  M.R. at 125; Dkt. No. 1-2 at 58.  The x-ray results revealed that the "fracture lines continue to be present" though the ankle mortice was intact.  Dkt. No. 1-2 at 38.  On September 13, 2007, Murray was discharged and scheduled for follow up appointments with orthopaedics and x-rays.  M.R. at 137.

On September 14, Murray complained of right arm numbness and issues with gripping his crutches, so he requested a walking boot for his cast.  M.R. at 8.  Three days later Murray returned to the infirmary making the same requests and was informed that the shoe for his cast was unavailable and that he was scheduled to see a doctor on September 21.  M.R. at 7.  On September 20, Murray went to an orthopaedic appointment where it was determined that his cast would be removed on October 26, 2007.  Mannava Decl. ¶ 8; M.R. at 7.  The following day, Murray saw Dr. Ramineni who advised Murray that he should avoid putting pressure on certain weight bearing spots while using the crutches and also stated that the pain and numbness in his arms would resolve once his cast was removed and he no longer required the crutches.  Ramineni Decl. ¶ 11; M.R. at 7.

On September 30, 2007, Murray received medical attention for an alleged fall down the

13

stairs.  M.R. at 6.[5]  Murray stated that he did not have symptoms of a headache, double vision, nausea or vomiting, or signs of scratches, bumps, redness or swelling.  M.R. at 6. On October 1, Murray complained about having to traverse the stairs on his crutches and the medical staff responded that they would "arrange for [the] bottom floor [and] call movement control."  M.R. at 5.  On October 10, 2007, Murray was still ambulating with crutches but was also issued a bottom bunk permit.  M.R. at 5.  Investigation, pursuant to a grievance filed after the event, indicates that there did not appear to be a "no stair" movement order before October 1, 2007, but even if there were, "medical was not aware of [the] move and has no authority to move an inmate."  Dkt. No. 57-4 at 206-207.

Murray was scheduled to have his cast removed the week prior to November 1, but he missed the bus and required a rescheduling of the appointment.  M.R. at 1.  A letter from Dr. Rubinovich to Dr. Ramineni indicated that Murray's cast was removed on November 2, after being on for eight weeks, and that Murray's foot was still swollen, though less tender. M.R. at 121; Dkt. No. 1-2 at 57.  New x-rays showed that the fracture had healed properly and was in a good position and physical therapy was recommended.  M.R. at 121; Dkt. No. 1-2 at 57.  Murray agreed to physical therapy, though stated that he would not go if it occurred at Walsh Correctional facility, to which Dr. Rubinovich replied that such decisions were up to security and Murray's primary treating physician.   M.R. at 121; Dkt. No. 1-2 at 57.  Dr. Rubinovich also recommended that Murray use a cane, instead of crutches, "for a period of time, as he gets his range of movement back."  M.R. at 121; Dkt. No. 1-2 at 57.

---

[5] Murray contends that the alleged failure to record and treat his injuries after the fall resulted from defendant Williams' indifference.  Compl. ¶¶ 45, 48, 58.  However, Williams did not work that day and thus was not the nurse who treated Murray.  Williams Decl. (Dkt. No. 57-12) ¶¶ 7-9.

The cane permit was initially given for a month, then later extended through May 19, 2008. M.R. at 3, 188-89; Dkt. No. 69-19 at 52, 71. On December 6, 2007, when Murray's cane permit was initially extended, it was noted that his range of motion was restored, though he was still scheduled to begin physical therapy. M.R. at 3.

On December 3, 2007, Murray began physical therapy. M.R. at 119. Over the next month, Murray received therapy at least seven times. M.R. at 112-119. As therapy progressed, Murray had no new complaints, and that he was tolerating the continued stretching and strengthening his ankle well. Id. Murray continued receiving treatment despite his refusal, on January 4, 2007, when he refused to go to further sessions at Walsh because he was "constantly being harassed . . . and [began] . . . having mental, emotional, raging fit[s] as a result." M.R. at 154; Dkt. No. 1-2 at 65. On August 1, 2008, Murray was ordered that for the next four months he was to participate in only sedentary programs with no lifting over twenty pounds. M.R. at 186; Dkt. No. 69-20 at 10.

Murray left Mid-State in December 2008, but provided medical records from his subsequent incarcerations. See Dkt. No. 69-17. From January 12, 2009 through March 3, 2009, Murray 's ability to ambulate was documented on six different occasions and his gait was steady, he was not in distress, and he was able to ambulate with ease. Dkt. No. 69-17 at 40-41, 43, 54-55.


**B. Abdomen**

While incarcerated at Great Meadow, Murray also underwent an abdominal ultrasound on April 14, 2005. M.R. at 84. The results were generally normal, other than showing

cholelithiasis[6].  M.R. at 84.  After complaints of stomach pain at the end of February 2006,

Murray underwent blood tests for H. Pylori,[7] an infection for which he had previously been

treated and believed to be the cause of his abdominal pain.  M.R. at 47-48, 93.  A few days

later, test results indicated that Murray did not have H. Pylori, but his abdominal pain

continued.  M.R. at 46, 95.

On March 3, 2006, medical staff ordered a CT of Murray's abdomen to discover what

was causing his abdominal pain.  M.R. at 46.  On March 16, Murray signed the consent

form to travel to Albany Medical Center for the CT scan.  M.R. at 45.  When Murray arrived

at the correctional facility's infirmary on March 23, he claimed he was unable to sit or walk,

that his stomach and bowels were swollen, that he had blood in his bowel movements, and

that these symptoms had persisted for six months.  M.R. at 44.  Murray did not report

symptoms of diarrhea or vomiting, he refused a physical examination, was "loud,

obnoxious, [and] agitated," and his behavior may have indicated psychiatric problems.  M.R.

at 44.  On March 28, 2006, the results of the CT revealed that there were no hepatic

masses in his liver, though there was visualization of probable cysts or free fluid.  M.R. at

81, 85-88; Dkt. No. 1-1 at 23-25.  Murray went for a follow-up appointment on April 2, 2006,

complaining of rectal pain and possibly requiring a colonoscopy.  M.R. at 43.  Two days

later, after continued complaints of pain, Murray showed no pain upon palpating his

abdomen, he was able to flex his lower back, his belly was soft and not tender, and there

---

[6] Cholelithiasis is "the presence or formation of gallstones."  Dorland's Illustrated
Medical Dictionary 318 (28th ed. 1994) [hereinafter "Dorland's"].

[7] H. Pylori is a bacterial "species that causes gastritis and pyloric ulcers in humans."
Dorland's at 739.

were no masses in his rectum.  M.R. at 42.  Murray was given a three month prescription for stool softners.  M.R. at 42.

Upon arrival at Mid-State, on April 18, 2006, Murray again began complaining of stomach pain and requesting medication for his H. Pylori infection.  M.R. at 34.  As blood work from February 2006 indicated that Murray no longer had H. Pylori, Murray was only scheduled to see the doctor.  Id.  On July 17, 2006, Murray again complained of stomach pains and requested a specialty consultation.  M.R. at 31.  Murray was already scheduled to see the doctor on July 20, so that any intervention would await the doctor's examination.  M.R. at 31.  On July 20 Murray saw a doctor.  M.R. at 3.

On July 31, 2006, Murray requested medication for pain in his stomach and additional drugs to treat his H. Pylori.  M.R. at 30.  No treatment was scheduled for him regarding any perceived abdominal issue.  M.R. at 30.  Murray was provided pain medication.  M.R. at 30.  On August 21, 2006, Murray again complained of ulcer pain.  M.R. at 29.  He was given pain medication and dismissed.  M.R. at 29.  The following day, Murray was seen by Dr. Mannava for his abdominal pain.  Mannava Decl. ¶ 4; M.R. at 28.  Murray had a history of the H. Pylori infection which was treated with triple antibiotic therapy, and it was concluded that Murray was suffering from recurrent gastritis.[8]  Mannava Decl. ¶ 4.  Murray was provided with pain medication and a prescription for Prevacid to treat the gastritis.  Id.  ¶ 4; M.R. at 28.  A few weeks later, medical staff was informed by Murray that he never received his Prevacid, and because the facility did not carry that particular drug it had not been provided, though staff immediately changed the prescription to Prilosec which was

_____

[8] Gastritis is an "inflammation of the stomach."  Dorland's at 680.

17

immediately available.  Mannava Decl. ¶ 4; M.R. at 28.

On October 27, 2006, Murray again complained of bloody stools resulting from his H. Pylori infection.  M.R. at 27.  Three days later, Murray was seen by a doctor and reassured that his test results for H. Pylori were within the normal limits in February 2006, indicating that there was no infection present.  M.R. at 27.  However, the doctor also ordered that blood work and stool samples be completed and a colonoscopy be performed if further indicated.  M.R. at 27.  On November 3, 2006, the lab results from the stool samples were reported negative.  M.R. at 73.  On December 18, 2006, Murray again visited the infirmary complaining of head aches caused by his contraction of H. Pylori.  M.R. at 24; Dkt. No. 1-2 at 29.  Medical staff informed Murray that H. Pylori was not the cause of any of his headaches, as had been proven by a CT scan of his head in 2005 which came back negative.  M.R. at 24; Dkt. No. 1-2 at 29.

On May 25, 2007, Murray began to complain about intestinal pain again.  M.R. at 22.  Murray was given Metamucil and Prilosec for his intestinal issues.  M.R. at 22.  On July 6, 2007, Murray was again seen by medical staff for complaints of intestinal pain and follow up with a doctor was arranged.  M.R. at 20-21; Dkt. No. 1-2 at 27-28.  Ferguson indicated that, until this point, the labs and ultrasounds had not indicated that referral to a specialist was appropriate.  Ferguson Decl. ¶¶ 11-12.  On July 17, 2007, Murray returned with complaints of rectal bleeding, though he failed to attend his examination the following day where the nurse indicated that these issues had been discussed earlier in the month, no further intervention was needed, and Murray could follow up with a sick call.  M.R. at 19.  On July 19, 2007, Murray returned to sick call and saw defendant nurse Howard with complaints of rectal bleeding.  Howard Decl. (Dkt. No. 57-8) ¶ 4.  Howard scheduled Murray for a follow

18

up appointment with Dr. Ramineni on July 30.  Id.  ¶ 5.   It was also noted that Murray had

been "asked to leave [the infirmary] yesterday [because he was] causing a disturbance."

M.R. at 18; Dkt. No. 1-2 at 26.

On July 27, 2007, Murray underwent an abdominal ultrasound.  M.R. at 78; Dkt. No. 1-2

at 46.  The findings indicated that his liver and bile ducts were both normal and that there

was an impression of asymtomatic small gallstones which required no further intervention.

Ramineni Decl. ¶ 7; M.R. at 78; Dkt. No. 1-2 at 46.  The presence of gallstones was

consistent with the earlier ultrasound in April 2005.  M.R. at 134; see also Dkt. No. 69-12 at

36 (reporting that Murray's ultrasound on June 13, 2005 "demonstrated 'gallstones' . . . a

non-life threatening condition usually not requiring treatment.").  On July 30, there were

additional complaints of abdominal pains and gallstones, though Murray exhibited no

symptoms of a gall bladder attack.  M.R. at 18; Dkt. No. 1-2 at 26.  On August 13, 2007,

Murray returned with complaints of abdominal pain, which he had also been treated for

earlier in the week when he was advised to take Tylenol instead of ibuprofen to lessen the

side effects on his gastrointestinal system.  M.R. at 15.  Murray was scheduled to see the

doctor again on August 31.  M.R. at 15.  Murray's medication was renewed a few days later.

M.R. at 15.

On November 1, 2007, Murray again began complaining about passing blood in his

stool.  M.R. at 1.  The following day, medical staff indicated that if Murray demonstrated

"any significant bleed" he was to be seen by medical immediately.  M.R. at 4.  On

November 7, Murray was seen for complaints of internal bleeding, though he "refused a

rectal exam" and provided staff with a "very unreliable history."  M.R. at 3.  On December

10, 2007, Murray was seen for a follow-up where he reported no additional rectal bleeding

and was diagnosed as most likely suffering from a hemorrhoid.  M.R. at 2.

Murray again complained of rectal bleeding on January 7, 2008 and was sent to a gastroenterologist who recommended a colonoscopy to determine the cause of the alleged bleeding.  M.R. at 1, 111.  On January 17, 2008, stool samples were taken which tested negative for blood.  Dkt. No. 69-18 at 34-35.  In March 2008, a colonoscopy was scheduled "but due to [Murray's] noncompliance with the preparation, it was cancelled."  Ramineni Decl. ¶ 16; see also Dkt. No. 69-20 at 9 (medical records indicating colonoscopy cancelled because Murray could not drink the preparatory liquid).  Murray contends that during the preparation, he was told to drink a substance which was dangerous to him due to his high blood pressure.  Murray Dep. at 49-50.  Murray ceased drinking the liquid when another inmate informed him it could kill him.  Id. at 50, 53-54.

On November 18, 2008, Murray again complained of stomach pain secondary to his H. Pylori infection.  Dkt. No. 69-20 at 5.  There was no recent treatment for H. Pylori and  as of 2006, Murray had tested negative for it.  Id.  At the end of November 2008, just prior to leaving Mid-State, Murray was hospitalized for abdominal pain and constipation.  Dkt. No. 69-13 at 14-17.  Upon arrival, Murray had no problems with feeding himself or ambulating. Id. at 21.  Murray cited additional complaints of intermittent rectal bleeding.  Id. at 23. Despite his complaints, Murray refused to undergo a rectal exam due to religious reasons. Dkt. No. 69-20 at 2.  Murray was discharged from the hospital without restrictions, with prescription medication including Prilosec, and advised to follow up with his doctor.  Dkt. No. 69-13 at 14-18.  Upon return to the correctional facility, Murray spent an additional two days in the infirmary resting comfortably without incident.  Id.  at 14-18.  Murray also underwent another x-ray and CT scan of his abdomen and pelvis.  Dkt. No. 69-13 at 2-3.

20

The x-ray results demonstrated nothing abnormal, noting no signs of impaction, distention, or intra-abdominal calcification.  Dkt. No. 69-13 at 2.  Additionally, the CT scan was also generally normal, with no acute inflammatory processes demonstrated and mild and small aberrations which did not require any further intervention.  Dkt. No. 69-13 at 3.  Stool sample tests for blood on December 8, 2008 also returned negative.

In October of 2009, Murray received a colonoscopy, preparing for the test by taking pills instead of ingesting liquid, and claiming the former method was superior and safer given his high blood pressure and recommendation from "the heart specialist who examined [his] heart and [said he] could [not] take all of that sodium that they had in [the initial drink which almost] . . . kill[ed him]."  Murray Dep. at 56-57; see also Dkt. No. 69-15 at 9.  During the colonoscopy two small polyps were removed and large internal hemorrhoids were noted.  Dkt. No. 69-15 at 3.  Murray was instructed to increase his fiber and water intake and was given medication for his hemorrhoids.  Id. at 4.

### C. Head

On July 6, 2005, Murray underwent a CT scan of his head.  M.R. at 83.  While there was evidence of a prior head trauma, there were no indications "of acute hemorrhage, mass, or mass effect," and the only other abnormality was "[s]inus inflammatory changes" to his right side.  M.R. at 83.  On December 18, 2006, Murray again visited the infirmary complaining of head aches caused by his contraction of H. Pylori.  M.R. at 24; Dkt. No. 1-2 at 29.  Medical staff informed Murray that H. Pylori was not the cause of any of his headaches, as had been proven by a CT scan of his head in 2005 which came back negative.  M.R. at 24; Dkt. No. 1-2 at 29.

**D. Blood Monitoring**

As early as January 30, 2006, Murray was recommended to wear knee stockings for his circulation.  M.R. at 30.  Additionally, beginning approximately June 15, 2006 until January 2009, Murray visited the hypertension clinic weekly and received blood pressure checks to monitor his hypertension.  M.R. at 32, 169-70; Dkt. No. 69-19 at 28, 42, 67.

Murray contends that as of March 2006, he should have been placed on blood thinners by defendant Dr. Paolano[9].  Compl. ¶¶ 46, 62; Paolano Decl. (Dkt. No. 57-9) ¶ 3; Murray Dep. at 14-17.  Murray contends that when he went to Albany Medical Center on March 28, 2006 for the CT scan of his abdomen[10] he was asked if he was on blood thinners, which he interpreted to mean that he should be on blood thinners.  Compl. ¶ 62; Paolano Decl. ¶ 4; Murray Dep. at 16. "The CT scan was ordered to evaluate [Murray's] chronic abdominal pain and elevated liver enzymes and had nothing to do with blood clots. . . in fact, [Murray] had no condition . . . that required blood thinners and no other physicians had ordered that such blood thinners be started," during this time in Murray's treatment.  Paolano Decl. ¶ 8; see also Id.  ¶ 9 (stating nothing in AMC's report pertained to blood clots or blood thinners); Dkt. No. 1-1 at 23-25 (diagnostic report from abdominal CT scan).

On June 6, 2006, Murray met with Dr. Ramineni to follow up on his hypertension.

---

[9] Attached to Murray's submission are additional grievances that he filed against Dr. Paolano while he was at Great Meadow regarding his medical care.  See Dkt. No. 69-12, Ex. B-12.  However, Murray has specifically stated that he only presently makes claims against Dr. Paolano for failing to begin him on blood thinners.  Compl. ¶¶ 46, 62; Paolano Decl. (Dkt. No. 57-9) ¶ 3; Murray Dep. at 14-17.

[10] Murray contends that this diagnostic procedure was an MRI.  However, medical records conclusively indicate that he was receiving a CT scan.  Paolano Decl. ¶ 6; M.R. at 43, 45, 81, 85-88; Dkt. No. 1-1 at 23-25.

Ramineni Decl. ¶ 5; M.R. at 31-32.  Murray sought surgical intervention for his varicose veins, and Dr. Ramineni noted that there was mild swelling in his legs and feet, the pulses in his feet were good, and that, at this time, there was "no intervention needed for varicose veins."  M.R. at 32; see also Ramineni Decl. ¶ 5.  Murray was given blood pressure medication and a follow up appointment was scheduled.  Ramineni Decl. ¶ 5; M.R. at 32.  On July 20, 2006, Murray complained of swelling and discoloration of his legs as well as a history of peripheral vascular disease ("PVD").  M.R. at 3.  Objective findings confirmed Murray's hypertension with swelling and PVD.  M.R. at 3.  Further medication was ordered.  M.R. at 3.

On May 25, 2007, Murray was seen by medical staff for his complaints of left lower leg swelling.  M.R. at 22.  On July 30, 2007, Murray complained of leg and ankle swelling and varicose veins.  M.R. at 18; Dkt. No. 1-2 at 26.  While Murray was given elastic stockings and told to keep his leg elevated, he insisted on seeing a specialist.  M.R. at 18; Dkt. No. 1-2 at 26; Ramineni Decl. ¶ 7.  The following day, when Murray was still insisting on receiving a second opinion about his leg, medical staff explained to him that Murray could not pick and choose the physicians that he wanted.  M.R. at 16; Dkt. No. 1-2 at 25.

On August 27, 2007, after fracturing his ankle, Murray was sent to Mt. Vernon hospital where diagnostic tests discovered: (1) a blood clot in his leg and deep vein thrombosis[11] in a portion of his leg; and (2) a doppler report from his leg which also showed a clot in one spot

---

[11] A deep vein thrombosis ("DVT") is a blood clot occurring deep in the veins which may cause swelling, pain, and discoloration.  Merck Manual 1792.  A DVT is "virtually always accompanied by phlebitis, thus the terms . . . are used interchangeably."  Id.  Thus, Murray's references in his complaint to phlebitis as both a serious medical and disabling condition are also known as blood clots.

in his leg though "[e]lsewhere, [there is] normal vascular flow identified."  M.R. at 77; Dkt.

No. 1-2 at 42, 44-45.  Mt. Vernon started Murray on blood thinners, with further instructions

to continue adjusting the blood thinners accordingly to maintain appropriate blood levels.

M.R. at 132; Dkt. No. 1-2 at 56.

 Beginning on September 7, 2007, Murray attended regular hematology screenings

measuring his INR values.[12]  M.R. at 64.  On September 7, Murray's INR values were

slightly low and follow up with his primary provider was recommended.  M.R. at 64.  Dr.

Ramineni ensured that his blood thinning medication was adjusted based upon the values

derived from the blood work on September 7 and 8.  Ramineni Decl. ¶ 12.  On September

25, Murray was still receiving blood thinners and was having blood work done regularly.

M.R. at 6.  On October 4, Murray's INR values were still slightly low and the doseage of the

blood thinners was increased.  M.R. at 5, 62.  On October 19, 25 and November 1, 8, 9,

and 16th, Murray's INR values were all within the normal range.  M.R. at 55-58, 60-61.

Murray's prescription for his blood thinners was also renewed for six months.  M.R. at 4.

 Beginning on December 7, 2007, Murray's INR values began to creep igher than the

normal range.  M.R. at 53.  On December 14 and 21 the values continued to increase

slightly.  M.R. at 49, 52.  However, by January 7, 2008, the INR readings were back within

normal levels.  M.R. at 51.  This trend continued through the Fall of 2008 and Murray's

blood levels continued to be monitored, with adjustments made as necessary to account for

fluctuation of the INR values which continued to increase, normalize, and then drop off

again.  Dkt. No. 69-18 at 10-33, 36, 38.  Murray's blood thinners were eventually cancelled

---

 [12] INR values are used to prevent or treat blood clots and embolization.
 See generally M.R. at 52.

in September 2008, after treating with them for a year, as is required when diagnosed with

a blood clot.  Ramineni Decl. ¶ 17; Murray Dep. at 22; Dkt. No. 69-20 at 7.

### E. Grievances[13]

Murray filed approximately twenty-two grievances[14] concerning his medical care and

forty appeals regarding the medical treatment that he received during the time in question.

Dkt. No. 57-4.[15]  The specific grievances referenced in Murray's complaint indicate that they

were filed after the alleged medical maltreatment.  See Compl. ¶¶ 21-22 (filed grievance on

defendant Dr. Ramineni which was denied on December 26, 2007 about treatment

allegedly not provided on September 21, 2007); 24 (filed grievance on October 17 after

being denied a boot for his cast on October 12); 26 (filed grievance on March 5, 2008 after

---

[13] Murray also claimed, and reported to the New York State Department of Health, that Dr. Ramineni had used racially derogatory remarks when denying his individual requests for medical care and reasonable accommodations.  Murray Dep. at 59; Ramineni Decl. ¶ 6; Dkt. No. 69-9, Ex. B-11 at 72-78.  These claims were found to be meritless.  Ramineni Decl. ¶ 6; Murray Dep. at 59-60.  To the extent that Murray alleges that Dr. Ramineni or others were verbally abusive to him, such contentions are insufficient to establish a basis for relief.  Allegations of verbal harassment alone are not actionable under § 1983.  See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1996).

[14]DOCS maintains a grievance program for inmate, known as the Inmate Grievance Program (IGP), through which inmates may seek remedies for mistreatment or misconduct by prison staff. The IGP is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the Superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

[15] Murray has also attached copies of his grievances to his moving papers.  Some of these citations are duplicates of those submitted by defendants.  See generally Dkt. Nos. 69-8, 10 & 11.  Citations will be made to the docket number associated with defendants' moving papers.

25

medical staff almost killed him preparing him for a colonoscopy on March 3, 2008).  The same pattern holds true as demonstrated by grievances referenced in defendants' moving papers (Ramineni Decl. ¶ 13) and those which were submitted by Murray.  See Dkt. No. 1-1 at 8-9, 11-12, 16, 20, 28, 44, 46, 49, 70, 72 (filing grievances after dates where Murray was allegedly subjected to Eighth Amendment violations).  Additionally, Murray indicated that he filed another grievance in an instance where he told an unnamed doctor that he felt he may have suffered a heart attack from a blockage caused by his varicose veins.  Compl. ¶ 49.

## F. ADA

Programming of inmates, including employment placement, is based on a medical evaluation.  Picente Decl. (Dkt. No. 57-10) ¶ 6; Dkt. No. 1-2 at 4; 69-9 at 11.   Murray claims that he was disabled due to "a chronic disease . . . which is [an] inflammation of a vein [in his leg] . . . caus[ing] pain and tenderness . . . discoloration . . . swelling . . . and pain in his joints;" and arthritis in his ankles, back and ribs.  Dkt. No. 69 at 6-7.  Murray began using a cane while incarcerated at Riker's Island in 1999.  Murray Dep. at 26.  There he claims to have had medically imposed limitations where he could not lift more than twenty pounds and he was limited to sitting and standing for only twenty minutes at a time.  Id. at 43.  On January 30, 2001, Murray was given an accommodation of a special chair  for his chronic lower back pain for work in the tailor's shop when he was incarcerated at Franklin Correctional Facility.  Murray Dep. at 44; Dkt. No. 1-1 at 86 (explaining that he was disabled due to lower back pain from a motor vehicle accident and that he was limited in his ability to sit and stand which has also caused him to need a back brace and cane).  However, later internal reports indicate that Murray was abusing his reasonable accommodation while

working.  Dkt. No. 1-2 at 4.

During 2001, Murray became classified as unemployable.  On February 5, 2002, a memorandum circulated about Murray's currently unemployable status and recommendation for receiving a medical review in order to place him in an appropriate assignment.  Dkt. No. 1-2 at 7, 69-9 at 14.  On March 6, 2002, medical staff confirmed that Murray was unable to be placed in a job.  Dkt. No. 1-2 at 4.  Thus, irrespective of the alleged issues with Murray appropriately using his chair, he was deemed unprogrammable because of his medical assessment.  Id.  This decision was again questioned on April 30, 2002.  Dkt. No. 1-2 at 9.  Internal memoranda stated that x-rays of Murray's skull were negative and, thus, he was medically cleared to be programmed.  However obstacles such as his "uncooperative, hostile [and] belligerent" attitude were cited as potential impediments.  Dkt. No. 1-2 at 8, 69-9 at 15.  In July 2002, efforts were made to schedule Murray for programming, but were unsuccessful due to his numerous medical call outs.  Dkt. No. 1-2 at 11; 69-9 at 18.  When medical staff stated that Murray had medical limitations, he disagreed and explained that the physician that had offered such restrictions had been fired and his new physician "would agree with his contention that he is medically unable to program."  Id.  In August 2002, medical services indicated that Murray was not programmable due to medical issues.  Dkt. No. 1-2 at 13; 69-9 at 20.  In October 2002, Murray was given medical restrictions stating he could not lift more than twenty pounds or sit for periods longer than one hour.  Dkt. No. 1-2 at 3; 69-9 at 10.

Murray lost his cane in 2003 while incarcerated at Bare Hill Correctional Facility, but he was located in the medical dormitory.  Dkt. No. 1-2 at 27-28.  Murray's cane was returned during his incarcerations at Clinton, Coxsackie, and Comstock Correctional Facilities,

27

except for a year long period when he was detained in SHU.  Id. at 27-28.  Murray claims his medical restrictions remained the same whether or not he was using a cane.  Id. at 46.

During Murray's Mid-State incarceration, he had no restrictions per the medical staff. Thus, Murray was "programmable with no limitations."   Picente Decl. (Dkt. No. 57-10) ¶ 6; see also Dkt. No. 57-4 at 123.  This remained Murray's status until after his fall in August 2007.  Picente Decl.  ¶ 7.  In Murray's most recent incarceration though, he does not utilize and has not asked to be provided with a cane.  Id. at 64.


## II.  Discussion

Murray alleges that his First Amendment rights were violated when defendants Ramineni, Mannava, Picente, Howard, Williams, and Harris denied him medical treatment because he filed grievances against them.  Compl. ¶¶ 21-22, 24, 26, 31, 49, 58; Murray Dep. at 47.  Murray also alleges that his Eighth Amendment rights were violated when defendants failed to treat his blood disorder, listen to his complaints of pain which led to his broken ankle, supply him with blood thinners and medication for his abdominal problems, and provide him with his cane, back brace, and bottom bunk permit.  Murray contends defendants conspired together in failing to provide him with adequate medical care.  Compl. ¶¶ 28, 31, 35, 54, 57, 63.  Lastly, Murray alleges that he was denied reasonable accommodations pursuant to the ADA, for his disabilities of his swollen ankles, degenerative back conditions, and gastrointestinal and blood issues.  Compl. ¶¶ 29, 40, 61; Dkt. No. 69 at 6-7.  Defendants contend that Murray's constitutional claims are meritless, he has failed to raise a question of material fact with regards to his ADA claims, and they are entitled to qualified immunity.

28

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

## B. Retaliation

Murray claims that defendants Ramineni, Mannava, Picente, Howard, Williams and Harris retaliated against him by failing to provide him with adequate medical care because he filed grievances against them.  To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996); see also Lipton v. County of Orange, 315 F. Supp. 2d 434, 447-48 (S.D.N.Y. 2004) (applying First Amendment retaliation factors to a pretrial detainee complaint).  Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration.  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008).  Conclusory allegations alone are insufficient.  Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).

In this case, Murray has failed to allege facts sufficient to support a retaliation claim. First, for the reasons indicated infra, Murray has failed to allege that he received any adverse action because the medical care which he received was appropriate.  Second, even assuming the care was deficient, he has failed to establish a causal connection. While filing grievances and lawsuits are actions protected by the First Amendment, Murray

has failed to establish that any of his alleged denials in treatment were precipitated by any specific grievance or investigation.  In fact, the grievances referenced in both parties' moving papers demonstrate the opposite.  Murray consistently grieved a lack of medical treatment after he was allegedly denied the treatment.  This is inapposite to the standard as the constitutionally protected conduct occurred after the alleged adverse action and therefore cannot be a substantial factor in motivating such actions.  Lastly, Murray's claims fail because they are generally conclusory and unsupported.  Jackson, 713 at 214.

     Accordingly, defendants' motion should be granted as to these claims.


### C. Eighth Amendment[16]

     The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  This prohibition extends to the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at

---

[16] Murray objects to the admission of his medical records for consideration during this motion, claiming they were not properly certified.  Dkt. No. 69 at 11-13.  However, counsel for defendants has provided a declaration indicating that the medical records were "maintained in the ordinary course of the business of the [DOCS] and have been provided by representatives of DOCS for purposes of this motion," thus certifying their authenticity. Higgins Decl. (Dkt. No. 57-3) ¶ 4.

844.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate grounds for a section 1983 claim."  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).  Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness.  Hathaway v.

32

Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

In this case, defendants state that Murray's sporadic complaints of chronic pain are insufficient to constitute a serious medical need.  Pain and discomfort may, in some circumstances, suffice to establish the first prong of the analysis if such pain is so extreme that it becomes a condition of urgency.  Chance, 143 F.3d at 702 (internal quotation marks and citations omitted).  However, defendants rely on Murray's repeated refusals for treatment and pain medication to indicate that his condition was not of such severity as that contemplated for Eighth Amendment protection.  However, defendants' reliance is misplaced as such refusals are generally indicative of defendants' lack of deliberate indifference.  See Brown v. Selwin, 250 F. Supp. 2d 299, 308 (S.D.N.Y. 1999) (discussing plaintiff's failure to establish deliberate indifference relying upon inter alia plaintiff's refusal of medical treatment on several occasions); Ross v. Kelly, 784 F. Supp. 35, 46-47 (W.D.N.Y. 1992) (holding that defendants did not deliberately delay medical care where the inmate "himself is largely to blame for many of the delays in treatment . . . [by] often second-guess[ing] and disagree[ing] with . . . physicians . . . [and] refus[ing] treatment altogether on a number of occasions.").  Thus, while relevant to the analysis, this is irrelevant to the objective prong.  However, it is immaterial whether Murray's pain was a serious medical need because, as discussed infra, he did not receive deliberately indifferent treatment for any of his many symptoms.

## 1. Blood Thinners

Murray contends that defendants actions were deliberately indifferent because they failed to begin prescribing him blood thinners in March 2006 and, if they had, he would not

have developed a blood clot in his leg after his fall in August of 2007.  However, Murray's points are conclusory and unsupported by medical opinion.  Dr. Ramineni specifically stated that the diagnostic test performed in March 2006 did not concern blood clots and nothing about the examination results indicated that blood thinners were required.  Murray's contentions otherwise amount to a disagreement in the medication he should have received, which is insufficient to support a claim for deliberate indifference.  Sonds, 151 F. Supp. 2d at 312.

Moreover, such claims are also insufficient because Murray does not have the required medical knowledge, or supporting testimony from a medical expert, to refute Dr. Ramineni's testimony to demonstrate that such medications were necessary and appropriate.  See R.T. v. Gross, 298 F. Supp. 2d 289, 296 (N.D.N.Y. 2003) (finding a lack of serious medical need "[b]ecause plaintiff has not submitted any verifiable evidence indicating that a failure to treat his condition adversely affected he prognosis . . . .") (citing inter alia  Hill v. Dekalb Regional Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir.1994), *abrogated on other grounds by* Hope v. Pelzer, 536 U.S. 730, 739 (2002) ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in the medical treatment to succeed.")).[17]

Furthermore, when blood thinners were indicated as an appropriate treatment method,

---

[17] Murray's claims that additional medical affidavits will be obtained and produced to further refute defendants' claims (Dkt. No. 69 at 13) are untimely as the deadline for discovery has expired.  Dkt. No. 50; but see Dkt. No. 60 (extending discovery for sole purposes of providing Murray with mental health records as requested in his motion to compel).

the medical record indicates that the medication was given for the appropriate amount of time and Murray's blood levels were consistently monitored.  When the levels began to fluctuate, his medication dosages were adjusted so that his levels were returned to within the normal ranges.  Such actions belie claims of either delay or deliberate indifference.

## 2. Abdominal Pain and Infections

To the extent Murray claims that defendants were indifferent to his abdominal issues, such complaints are also insufficient to establish Eighth Amendment violations.  The medical record indicates that, upon Murray's complaints, he was sent in for various diagnostic tests to determine the cause of his pain.  Radiology results indicated asymptomatic gallstones and, most recently, other generally normal findings.  Thus, despite the continued complaints of pain, objective diagnostic tests indicated that there was nothing to treat other than to attempt to alleviate the discomfort.

Additionally, Murray was seen on numerous occasions for complaints of pain and blood in his stools.  In response to these complaints Murray was prescribed both pain medication and Prilosec and was also sent in for stool sample tests which all came back negative.  These repeated interactions and provisions of medications belie claims of indifference or delay.  Moreover, the continued prescription of these medications by all medical personnel that Murray has encountered over the past several years, including outside hospital staff and other correctional facilities' medical staff, gives further support to the reasonableness and appropriateness of the treatment.

Moreover, Murray's continued claims that he was suffering from H. Pylori were contradicted by the objective medical evidence.  Upon discovery of the infection, Murray

was treated with a triple antibiotic regimen.  When doubts arose concerning the cause of his pain in February 2006, another diagnostic test was completed which indicated that Murray was negative for the infection.  The continued interventions of medical staff, the repeated prescriptions of medications, and the multiple diagnostic tests performed indicate that staff was neither delaying nor indifferent to his treatment.  Murray's complaints that he should have been receiving a different medication for his ailments is again, nothing more than a disagreement over treatment methods which is insufficient to state deliberate indifference. Sonds, 151 F. Supp. 2d at 312.  To the extent that Murray contends he should have been seen by a specialist, such contentions are also unavailing.  Inmates are not guaranteed treatment that they prefer or request.  Rather, they are guaranteed adequate medical treatment.  Id.  The medical record indicates that Murray received such treatment.

Finally, to the extent that Murray claims Dr. Ramineni attempted to kill him by prescribing a liquid, as opposed to pill, preparation regimen prior to attending a colonoscopy, such contentions are also meritless.  Murray contends that the medical advice to cease drinking the liquid came from another inmate, not a physician.  As previously indicated, such information is not verifiable medical evidence sufficient to prove deliberate indifference.  Hill, 40 F.3d at 1188.  Simply because Murray preferred taking pills instead of drinking the liquid, does not indicate that drinking the liquid was inappropriate.  Again, this amounts to a disagreement in treatment methods which is insufficient to establish an Eighth Amendment violation.  Sonds, 151 F. Supp. 2d at 312.  To the extent Murray alleges that Dr. Ramineni's actions were incorrect because a different physician prescribed him different medication in preparation for the colonoscopy, such allegations are still insufficient to establish an Eighth Amendment violation.  Merely because two physicians decided upon

36

different treatment methods, this remains at worst a difference of opinion and not evidence of deliberate indifference.  See Douglas v. Stanwick, 93 F. Supp. 2d 320, 325 (W.D.N.Y. 2000) ("[T]he fact that [a physician's] directive may have been contrary to [another physician's] . . . does not indicate [deliberate indifference] . . . . Not every physician will treat every ailment in exactly the same manner.  That does not mean that one of the physicians must be acting with deliberate indifference . . . .").

### 3. Joint Pain

To the extent that Murray contends he did not receive adequate pain relief and intervention for his back and ankle ailments, such contentions are without merit.   First, the medical record is replete with instances where medical staff attended to Murray's complaints, providing him with assistive devices, pain medication, diagnostic tests, and therapy.  Murray received sporadic, yet consistent, medical intervention.  Prior to his fall and fractured ankle, Murray's medical records indicate that he was seen in the infirmary at least thirty-eight times for complaints of joint pain and sent out for at least three sets of x-rays. The x-rays indicated that Murray's back and left ankle were generally normal with nothing more than mild degenerative changes occurring.  Accordingly, there was nothing objectively indicated which required treatment other than relief and management of Murray's chronic pain.

Throughout this time period Murray was also being prescribed various types of pain medication and muscle rub.  Medical records indicate that, prior and subsequent to having his ankle casted, Murray was generally able to ambulate without any problems, have full range of motion in his extremities, had good pedal pulses, was dramatic and agitated, and

was generally diagnosed as malingering.  In spite of these observations, medical records indicate that medical personnel continued to attend to and offer Murray pain medication. Such interventions contradict allegations of delay or indifference.  To the extent that Murray contends that he should have been prescribed different medications, or required the additional assistance of ambulatory devices such as a cane and back brace, such allegations constitute no more than a difference of opinion regarding treatment.  This is insufficient to establish deliberate indifference.  Sonds, 151 F. Supp. 2d at 312.

Moreover, throughout this treatment it was noted several times in the record that Murray refused to see, speak to, or receive medication or treatment from medical staff.  As previously indicated, these actions cannot now be imputed to defendants to establish deliberate indifference.  See Ross v. Kelly, 784 F. Supp. 35, 46-47 (W.D.N.Y. 1992) (holding that defendants did not deliberately delay medical care where the inmate "himself is largely to blame for many of the delays in treatment . . . [by] often second-guess[ing] and disagree[ing] with . . . physicians . . . [and] refus[ing] treatment altogether on a number of occasions.").

The treatment that Murray received after he broke his ankle was also not deliberately indifferent.  Upon falling, Murray was sent away to an outside emergency room for further evaluation.  It was St. Luke's emergency medical personnel that determined what course of action should initially be taken to treat the fracture.  Thus, the medical personnel at Mid-State had nothing to do with the decision to place Murray in an air cast.  Mid-State deferred to the medical judgement of other, better suited, professionals which refutes any allegations of deliberate indifference.

Furthermore, when Murray returned to Mid-State, the medical staff kept him in the

infirmary until he could regain his strength and ambulate well on his crutches.  The staff provided him with constant observation, pain medication, and a consultation with the orthopaedist.  To the extent that, upon arriving at Sing Sing and Mt. Vernon hospitals those medical staffs chose to pursue different treatment regimens, those constituted a difference in opinion than what the St. Luke's emergency personnel recommended.  Mid-State staff continued to provide Murray with care when he was housed in their facility.  If that care was inappropriate, based upon the recommendations of St. Luke's, that is at best medical malpractice which is also insufficient to establish an Eighth Amendment claim.  Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Additionally, the continuing treatment that Murray received after he broke his ankle also militates against contentions of deliberate indifference.  After returning to Mid-State, Murray was seen by medical staff at least a dozen times regarding joint pain and his ankle.  He was sent out for additional x-rays to monitor and compare the healing process of his ankle.  He had eight sessions of physical therapy, to which he responded well, to stretch and strengthen his weakened ankle.  After Murray broke his ankle, Dr.  Mannava indicated that, from time to time, Murray received bottom bunk permits as were deemed medically necessary.  To the extent that Murray claims these permits should have been given more often, such contentions indicate nothing more than a disagreement in treatment which is not actionable.  Goodson v. Williard Drug Treatment Campus, 615 F. Supp. 2d 100, 101-102 (W.D.N.Y. 2009) (holding that whether or not to issue a bottom bunk is "[a]t most . . . a difference of opinion between him and defendants . . . .") (citing cases).  At best, the decision to assign Murray a lower bunk only intermittently, based on his medical record as a

whole, indicates negligence, which too is insufficient to state a constitutional violation.  Id. at

102.  This same analysis holds true with Murray's cane permit.  Murray's cane was returned

from December 2007 until May 2008 after his cast was removed and he was attending

physical therapy to gain strength.  Any allegations that the cane should have been

prescribed throughout Murray's stay in Mid-State represents at worst, a difference in

treating opinion and, at best, medical malpractice, both of which are insufficient to sustain

an Eighth Amendment violation.

   Finally, Murray claims that defendants were deliberately indifferent for making him climb

stairs on September 29, 2007, causing him to fall.  Dkt. No. 69 at 17.  Medical records

indicate that Murray received treatment immediately after the fall and had no subjective

complaints or objective findings of injuries, dizziness, or nauseousness.  Additionally, it

appears that Murray did not have a "no stairs" permit until October 1, after his alleged fall.

Even if there was a permit in Murray's medical record, there is nothing which indicates that

medical staff had any knowledge of the move and failed to inform the officers of Murray's

restriction or that the officer in charge of Murray's movement was aware of his permit status

and purposefully and deliberately ordered him to climb the stairs knowing he could fall.

Thus, assuming its existence, the failure to adhere to the "no stairs" permit was at worst

negligence as (1) medical staff was unaware Murray was being moved so they could not

inform anyone of Murray's restriction and (2) the individual moving Murray was unaware he

should not be on stairs.  Estelle, 429 U.S. at 106.  Accordingly, the evidence proffered by

Murray is insufficient to establish an Eighth Amendment violation.  Moreover, medical staff's

quick attention to Murray after the fall and calls to place him on the bottom floor and bottom

bunk indicate that they were not indifferent to his condition.

Accordingly, defendants' motion should be granted as to these claims.

## D. ADA Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of . . . a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA "applies to inmates in state prisons." Beckford v. Portuondo, 151 F. Supp. 2d 204, 220 (N.D.N.Y. 2001) (citations omitted). To state a claim under the ADA, an inmate must demonstrate that

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

Clarkson v. Coughlin, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

As to the first element, a person is an individual with a qualified disability if "(A) a physical or mental impairment . . . substantially limits one or more of the major life activities of such individual, (B) [there is] a record of such an impairment, or (C) [the individual is] being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C).

> To determine if an individual meets any of the above criteria, courts apply a three part test . . . First, a plaintiff must show that [he or] she suffers from a physical or mental impairment. Second, the plaintiff must establish that the activity [he or] she alleges to be impaired constitutes a "major life activity." Third, the plaintiff must show that [his or] her impairment "substantially limits" the major life activity previously identified.

Smith v. Masterson, 538 F. Supp. 2d 653, 657 (S.D.N.Y. 2008) (internal citations omitted).

First, a claim under the ADA cannot be brought against individuals and, therefore,

41

defendants' motion as to the individual defendants must be granted as to the ADA claims.

See Fox v. State University of New York, 497 F. Supp. 2d 446, 451 (E.D.N.Y. 2007); Hallet

v. New York State Dep't of Corr. Serv., 109 F. Supp. 2d. 190, 199 (S.D.N.Y. 2000).

Second, Murray has proffered no evidence to establish the first element of his claim.

Murray characterizes his medical problems in the complaint as swelling and pain in various

joints and issues with his blood.  However, he fails to allege any facts indicating how these

substantially limited his life activities. Murray's opposition papers claim that he was unable

to walk.  Dkt. No. 69 at 9.  However, Murray's conclusory allegations of severe pain and

ambulatory issues are refuted by the objective medical records which continually

demonstrated that he was able to ambulate normally, had full range of motion, and was

generally seen as malingering.[18]  Moreover, despite these contentions, Murray's own

testimony indicates that he no longer utilizes a cane where he is currently incarcerated.

Additionally, medical records immediately subsequent to his Mid-State incarceration include

multiple observations regarding Murray's ability to ambulate.  As Murray has failed to

identify, and a liberal reading of the facts have failed to support contentions of such a

limitation, his claim lacks evidentiary support.

Third, the gravamen of Murray's claims of denial of benefits revolves around his

medical treatment.  However, such complaints concerning medical treatment are insufficient

to state a claim under the ADA.  See United States v. Univ. Hosp., 729 F.2d 144, 156-60

(2d Cir. 1984); see also Burger v. Bloomberg, 418 F.3d 882, 883 (8th Cir. 2005) ("A lawsuit

---

[18] When Murray fractured his ankle and was forced to use crutches, medical records still indicated that he could ambulate well with the crutches.  The same notes were seen in the records when Murray was temporarily using a cane and attending physical therapy to increase the strength in his ankle.

under the Rehab Act of the Americans with Disabilities Act (ADA) cannot be based on medical treatment decisions.") (citing cases).  Accordingly, defendants' motion as to the ADA claim should be granted on this ground.

   To the extent that Murray has asserted claims under the Rehabilitation Act, 29 U.S.C. § 706 et seq. ("RA"), they too are untenable. The RA protects any "qualified individual with a disability . . . [from] be[ing] excluded from the participation in, . . . [or] denied the benefits of," any federally funded program "solely by reason of his or her disability . . . ."  29 U.S.C. § 794(a); see also Clarkson, 898 F. Supp. at 1037-38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act").  First, individual defendants cannot be held liable under the RA.  See Lane v. Maryhaven Ctr. of Hope, 944 F. Supp. 158, 165 (E.D.N.Y. 1996) (dismissing ADA and RA claims against individual defendant).  Second, since Murray cannot prove the elements of an ADA claim, he is also unable to proffer facts sufficient to support a RA claim.  Accordingly, to the extent that Murray asserts any claims under the RA, defendants' motion as to such claims should also be granted.


**E. Conspiracy**

   "Section 1985 prohibits conspiracies to interfere with civil rights."  Davila v. Secure Pharmacy Plus, 329 F. Supp. 2d 311, 316 (D. Conn. 2004). To state a claim for relief under § 1985(3), a plaintiff must show:

>                 (1) a conspiracy; (2) for the purpose of depriving, either directly
>                 or indirectly, any person or class of persons of the equal
>                 protection of the laws, or of equal privileges and immunities
>                 under the laws; and (3) an act in furtherance of the conspiracy;
>                 (4) whereby a person is either injured in his person or property or

deprived of any right of a citizen of the United States.

United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-29

(1983).  Additionally, a plaintiff "must demonstrate that the defendant . . . acted with class-

based invidiously discriminatory animus."   Webster v. Fischer, 694 F. Supp. 2d 163, 196

(N.D.N.Y. 2010) (citations omitted).

Here, Murray does not assert any facts giving rise to a conspiracy.  First, Murray

vaguely asserts conclusory statements relating to an alleged conspiracy among defendants.

This is insufficient.  See generally Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999)

(granting summary judgment for a § 1985(3) claim where the "assertions were conclusory

and vague, and did not establish the existence of an agreement among defendants to

deprive [plaintiff] of his constitutional rights.").  Second, there has been proffered no

evidence relating to agreements, or even communications, between the  defendants, the

purpose of their alleged conspiracy, or an intent by defendants to deprive Murray of his civil

rights.  See Webb v. Goord, 340 F.3d 105, 110-11 (2d Cir. 2003) ("In order to maintain an

action under Section 1985, a plaintiff must provide some factual basis supporting a meeting

of the minds, such that defendants entered into an agreement, express or tacit, to achieve

the unlawful end.") (internal quotation marks and citations omitted); see also Romer v.

Morgenthau, 119 F. Supp. 2d 346, 364 (S.D.N.Y. 2000) (explaining that a plaintiff "cannot

satisfy the conspiracy prong [if] his claims are too general and conclusory to sufficiently

plead the meeting of the minds requirement.") (citations omitted).  Murray also fails to allege

or establish discriminatory animus.

Additionally, if any defendant "ha[d] knowledge that any of the wrongs . . . mentioned in

section 1985 . . . [we]re about to be committed, and ha[d] power to prevent or aid in

44

preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do . . ., [he] shall be liable to the party injured." 42 U.S.C. § 1986. However, "[a] claim under section 1986 . . . lies only if there is a viable conspiracy claim under section 1985." Gagliardi v. Vill. of Pawling, 18 F.3d 188, 194 (2d Cir.1994). No such viable claim has been shown here.

Accordingly, defendants' motion as to this claim should be granted.


## F. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights . . . immunity might still be available as a bar to . . . suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry need not be reached because, as discussed supra, accepting all of Murray's

45

allegations as true, he has not shown that any of these defendants violated his constitutional rights.  Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted.

### G. Damages For Emotional Distress

Murray seeks a judgment for emotional distress damages he sustained.  Compl. ¶ 61. Pursuant to the Prisoner Litigation Reform Act of 1995 ("PLRA"), "[n]o Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  Construing the facts in the light most favorable to Murray, it appears he contends that his chronic pain served as the catalyst to his emotional distress.  However, medical records memorialized Murray's subjective history in which he stated that this chronic pain had been in existence for fifteen years, far before Murray was attended by any of the individual defendants named in this suit.  Thus, any alleged physical injury was not a result of defendants' conduct.  Additionally, radiology reports indicate that Murray suffered from mild degenerative joint changes, which is not objectively indicative of a physical injury. Because Murray has failed to allege that he has suffered any concomitant physical injury, he is precluded from recovering any type of compensatory damages related to emotional distress.   Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999) ("[I]n the case of suits seeking damages for mental or emotional injuries. . . a defendant in a prisoner § 1983 suit may also assert an affirmative defense the plaintiff's failure to comply with the PLRA's requirements [and make a prior showing of a physical injury].").   Accordingly, to the extent that Murray seeks compensatory damages, such claims are precluded by the PLRA.

46

Therefore, in the alternative, defendants' motion on this ground should be granted.

Moreover, to the extent that Murray is attempting to bring a state law claim for intentional infliction of emotional distress, such claims are inappropriate to decide here. Federal courts have supplemental jurisdiction over such pendent state law claims pursuant to 28 U.S.C. § 1367. It is recommended herein, however, that defendants be granted judgment on Murray's federal claims on which rests federal jurisdiction over the pendent state law claims.  Murray asserts no other basis for the Court's jurisdiction over these claims and, therefore, the Court should decline to exercise supplemental jurisdiction over Murray's state law claims if the recommendations herein are accepted. <u>See</u> 28 U.S.C. § 1367(c)(3). Accordingly, such causes of action should be dismissed without prejudice.


### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that

1. Defendants' motion for summary judgment (Dkt. No. 57) be **GRANTED** as to all federal claims and all defendants;

2. Murray's state law claims be **DISMISSED** without prejudice; and

3. This action be **TERMINATED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** <u>Roldan v. Racette</u>, 984

F.2d 85, 89 (2d Cir. 1993); <u>Small v. Sec'y of HHS</u>, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  March 3, 2011
        Albany, New York

David R. Homer
U.S. Magistrate Judge